CRAIG M. PETERS, NO. 184018
**ALTAIR LAW LLP**
465 California Street, 5th Floor
San Francisco, CA 94104
Phone: (415)988-9828
Email: cpeters@altairlaw.com
(*Co-Counsel/Local Counsel*)

THERON HARDEE BASS, III (Admitted *Pro Hac Vice*)
JOHN SCAROLA (Admitted *Pro Hac Vice*)
**SEARCY DENNEY SCAROLA BARNHART & SHIPLEY P.A.**
2139 Palm Beach Lakes Blvd.
West Palm Beach, FL 33409
Phone: (561) 686-6300
Email: thb@searcylaw.com; thbteam@searcylaw.com
Email: jsx@searcylaw.com; mmccann@searcylaw.com; _scarolateam@searcylaw.com
(Admitted *Pro Hac Vice*)

ATTORNEYS FOR PLAINTIFF
JOHN DOE

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO-OAKLAND DIVISION

| | |
|---|---|
| JOHN DOE, Individually and on behalf of all others similarly situated<br><br>           Plaintiffs,<br><br>    v.<br><br>X CORP., (f/k/a Twitter, Inc., d/b/a X), and X.AI CORP., (d/b/a xAI)<br><br>           Defendants. | CASE NO. 3:25-cv-07597<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR (1) TEMPORARY RESTRAINING ORDER, WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM**<br><br>**Hearing Date/Time:** N/A (*ex-parte* motion pursuant to Civil L.R. 7-10 and Rule 65(b)(1), *Fed.R.Civ.P.*) |

1

# TABLE OF CONTENTS

| **Section** | **Page** |
|---|---|

TABLE OF AUTHORITIES ……………………………………2

INTRODUCTION ………………………………………… 4

FACTUAL BACKGROUD ………………………………………. 8

LEGAL ARGUMENT ……………………………………….. 18

    John Doe is entitled to entry of a Temporary Injunction …. 18

    There is a likelihood of success on the merits …………… 19

    Plaintiff will suffer irreparable harm ……………………….22

    Balance of equities tips in Plaintiff's favor …………… 26

    Granting injunctive relief is in the public interest ………… 26

    The security requirement should be waived ……………… 27

    Preservation of anonymity permitted ………………………29

CONCLUSION ……………………………………………..30

# TABLE OF AUTHORITIES

15 U.S.C. § 6851 ………………………………….    multiple pages throughout

18 U.S.C. $ 2256 …………………………………………… 4, 9, 21

18 U.S.C. § 2257 …………………………………………… 11

*Doe v. Sultan*, 2023 WL 70279676 (W.D. N.C. Oct. 25, 2023) …. 18, 27

*Doe v. Spencer*, 2023 WL 1484924 (M.D. Tenn. Feb. 2, 2023) …. 18

*Doe v. Spencer*, 2023 WL 5153569 (M.D. Tenn. Jan. 11, 2023) … 18

*Doe v. Smith*, Case 2:24-cv-634-ES-JBC, United States District Court for the District of New Jersey, D.E. No. 24 and D.E. No. 49 ….    18

*Pablo Sequen v. Kaiser*, 2025 WL 2203419 (N.D. Cal. Aug. 1, 2025) ...    18

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) …………… 18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ………. 19

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM

*Alliance for the Wild Rockies v. Peña*, 865 F.3d 1211 (9th Cir. 2017) …… 19

*Doe 4 v. Lyons*, 2025 WL 1208072 (W.D. Wash. April 25, 2025) ………. 19

*U.S. v. Runyan*, 290 F.3d 223 (5th Cir. 2002) …………………………... 21

*U.S. v. Carroll*, 105 F.3d 740 (1st Cir. 1997) …………………………… 21

*Alcantara v. Archambeault*, 462 F.Supp.3d 1073 (S.D. Cal. May 26, 2020) 22

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) ……………………… 22

*U.S. v. Hotaling*, 634 F.3d 725 (2nd Cir. 2011) …………………………... 23

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) ……………………... 23

*New York v. Ferber*, 458 U.S. 747 (1982) ………………………………… 24

*U.*S. v. *Anderson*, 759 F.3d 891 (8th Cir. 2014) …………………………… 24

Rule 65, *Fed.R.Civ.P.* ……………………………………………………... 27

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) ……………………... 28

*Russell v. Walmart, Inc.,* 680 F.Supp.3d 1130 (N.D. Cal. July 5, 2023) …. 29

*ESG Capital Partners, LP v. Stratos,* 828 F.3d 1023 (9th Cir. 2016) ……. 29

*U.S. v. Aylo Holdings S.A.R.L.,* Case No. 1:23-cr-00463, United States
District Court for the Eastern District of New York ……………………... 28-29

3

# INTRODUCTION

The right to control the bounds of the disclosure of one's intimate visual depiction is a well-established intellectual property right.  Yet this right is recklessly violated by X (formerly Twitter), through the nonconsensual disclosure of identifiable individuals' intimate images (**hereinafter "NCII"**).

15 U.S.C. § 6851 (**hereinafter the "NCII Statute"**)[1] provides victims of NCII a civil remedy for the non-consensual disclosure of their intimate images.  Under the NCII Statute, "disclose" is a defined term, meaning to transfer, publish, distribute, or make accessible.  15 U.S.C. § 6851(a)(4).  An "intimate image," under the NCII Statute, is a visual depiction that depicts:

- the uncovered genitals, pubic area, anus, or post-pubescent female nipple of an identifiable individual

- the display or transfer of bodily sexual fluids on to any part of the body of an identifiable individual, from the body of an identifiable individual, or an identifiable individual engaging in sexually explicit conduct (as defined in 18 U.S.C. § 2256(2)(A) & (B))

- actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex

- bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the anus, genital or pubic area of any person.

15 U.S.C. § 6851(a)(5) & (6) and 18 U.S.C. § 2256(2)(A) & (B).

Defendants X and xAI disclose[2] intimate images consistent with the descriptions above

---

[1] Emphasis added on initial mentions of "NCII" and "NCII Statute" because each will be referenced often throughout this motion.

[2] Use of the term disclose (or related terms like disclosed, disclosing, and disclosure) throughout this motion, and the corresponding complaint, is as defined in the NCII Statute.

4

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM

without the consent of the depicted individual(s) or in reckless disregard whether the depicted individual(s) have not consented to disclosure.  Also, X and xAI do not have a meaningful system in place to verify the age of the depicted individual, and if the individual is an adult (because minors cannot consent to such disclosures), whether the individual consents to the disclosure of their intimate image.  As such, a verified class action complaint pursuant to the NCII Statute has been filed by Plaintiff John Doe, on behalf of himself and all other similarly situated persons whose intimate visual depictions have been disclosed by X and xAI without consent.

In addition to permitting the recovery of liquidated monetary damages for the non-consensual disclosure of intimate images, the NCII Statute also permits a court to order equitable relief, including a temporary restraining order, a preliminary injunction, or a permanent injunction ordering a defendant to cease display or disclosure of the visual depiction.  15 U.S.C. § 6851(b)(3)(A)(ii).  This motion is brought pursuant to this explicit provision of the NCII Statute, and the relief specifically sought is stated in the contemporaneously filed Motion.

But even if it were not explicitly permitted by the NCII Statute, immediately ceasing the display or disclosure of such images seems fundamental, and an obvious first step (as requested in the Motion) in protecting victims of NCII in a lawsuit brought pursuant to the NCII Statute.  In fact, even X, a defendant in this case, acknowledges that the disclosure of intimate images without consent is a "severe violation of privacy," which "poses serious safety and security risks," and "can lead to significant physical, emotional, and financial hardship for those affected."  *See* X H2 2024 Global Transparency Report in re: Non-Consensual Nudity, https://transparency.x.com/en/reports/global-reports/2025-transparency-report (last visited September 8, 2025).  A seemingly obvious second step, also requested in the Motion - and

5

consistent with the NCII Statute, as well as the balancing of an individual's own right to give (or deny) consent to the disclosure of their own intimate image and a platform like X's right to disclose consensual intimate images - is to require meaningful verification of the age of the depicted individual and, if of age, whether the individual consents to the disclosure of their intimate image.

The scenario that has played out over the last few years regarding Pornhub, a site that allows visitors to view pornographic videos, is illuminative.  Launched in 2007, for much of its existence, Pornhub allowed unverified users to post sexually explicit content that lacked meaningful certification of the age and consent of the depicted person(s).  In December 2020, the New York Times published an investigative opinion piece on Pornhub, and its monetization of nonconsensual pornographic content, revenge pornography and child rape videos. (https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html, last visited on September 8, 2025.)  Backlash from the expose caused Pornhub to enact changes, including banning unverified video uploads.  (https://www.theguardian.com/global-development/2020/dec/10/pornhub-to-ban-unverified-uploads-after-child-abuse-content-claims last visited on September 8, 2025.)  This purge of content reduced the number of videos on the site "from 13 million to just 4 million." (https://www.theguardian.com/technology/2020/dec/14/pornhub-purge-removes-unverified-videos-investigation-child-abuse last accessed on September 8, 2025.)  As well, Pornhub was the target of a criminal prosecution by United States Attorney's Office for the Eastern District of New York for engaging in unlawful monetary transactions involving sex trafficking proceeds. (https://www.justice.gov/usao-edny/pr/pornhub-parent-company-admits-receiving-proceeds-sex-trafficking-and-agrees-three-year, last accessed on September 8, 2025.)    This prosecution resulted in a Deferred Prosecution Agreement ("DPA"), which included the appointment of an

6

independent monitor, who among other things was tasked with assessing the robustness of Pornhub's content screening and monitoring process, to mitigate and remediate takedown requests or allegations of the presence of illegal content, and to make recommendations to Pornhub. *Id.* Ultimately, Pornhub underwent a rebranding of its own and it has been reported that it will start verifying the age and consent of those featured in new videos uploaded to the site, but not all other videos already on the site. (https://www.newsweek.com/pornhub-still-crime-scene-even-after-its-rebrand-opinion-1927282, last visited September 8, 2025) Due to the severe consequences that the disclosure of nonconsensual intimate imagery can have on the depicted individual and the "perpetual torment" that victims can face in having to continually deal with images that might have been taken-down but then reappear on the internet, the afore-cited Newsweek opinion piece called for the need for reliable, third-party age and consent verification for every individual in every video [or image] that exists on every website distributing user-generated porn. *Id.*

In touting the aforementioned Pornhub DPA as providing oversight and compliance regarding content on the site, the U.S. Attorney for the Eastern District of New York stated that the resolution will "develop industry-wide standards for safety and compliance." (https://www.justice.gov/usao-edny/pr/pornhub-parent-company-admits-receiving-proceeds-sex-trafficking-and-agrees-three-year, last accessed on September 8, 2025). But has it? Insofar as X is concerned, its own Transparency Report would suggest otherwise. And, just within the past few weeks, a BBC News Investigation Report reported that a victim of child sexual abuse has begged Elon Musk to stop links offering images of her abuse being posted on his social media platform X. (www.bbc.com/news/articles/cq587wv4d5go, last visited September 8, 2025).

Enough is enough. This motion for injunction is permitted by the statute under which this claim is being brought, and the requested relief is consistent with the explicit language of the

7

statute.  Granting it will prevent continued and irreparable harm to NCII victims and will merely obligate X to do what it always should have been doing since it began disclosing intimate and sexually explicit images of individuals to its users – meaningfully verifying the age AND consent of a depicted individual before disclosure.  It will also remove all NCII from xAI, which upon information and believe is disclosing NCII via transfers across its systems, and will keep it safe from access and future disclosure by virtue of hacking, security breaches and attacks on xAI systems.  Even though obtaining consent pre-disclosure of an individual's intimate image should be standard operating procedure and the norm, in the current environment regarding NCII in general and under the specific claim being brought, requiring these consents before disclosure of an individual's intimate images doesn't really seem all that controversial of a prerequisite.

## FACTUAL BACKGROUND[3]

X, formerly known as Twitter, is a social networking service where users can post text, images and videos.  These posts are then disclosed, as defined in the NCII Statute,[4] by X to the public and users of the platform.  Launched in 2006, by 2022, Twitter had hundreds of millions of daily active users ("DAUs") and monetizable daily active users ("mDAUs") globally.  A DAU is the count of users who perform a certain action on the platform every single day, a mDAU is a DAU who also makes a purchase or transaction within a specific time frame, and a MAU is a monthly active user.  As of the second quarter of 2022, Twitter boasted 238 million mDAUs globally.  During this time, Twitter was one of the few major social media platforms that allowed content depicting nudity to be posted on its service and then disclosed by it.  And yet, while it continued disclosing content depicting nudity, Twitter was aware it was disclosing NCII,

---

[3]See also Verified Class Complaint reciting same factual background, and John Doe verification page with Motion.
[4] The term "disclose" is a defined term in the NCII Statute, and means to transfer, publish, distribute, or make accessible.  15 U.S.C. § 6851(a)(4).  Its use throughout this motion (and the corresponding complaint) is as defined in the NCII Statute.

8

including child sexual exploitation content.  For example, over the first half of 2018, Twitter suspended a total of 487,363 accounts for violations related to child sexual exploitation, and 244,188 accounts for these violations over the first half of 2019.  ***See* Exhibits 4 and 5**. By October 2022, nudity constituted an estimated 13% of the content being disclosed by Twitter.

On October 1, 2022, a federal civil cause of action relating to the nonconsensual disclosure of an individual's intimate image was created.  *See* 15 U.S.C. § 6851 (the "NCII Statute").  Prohibited from disclosure without the depicted individual's consent is a visual depiction[5] of the uncovered genitals, pubic area, anus, or post-pubescent female nipple of an identifiable individual, the display or transfer of bodily sexual fluids on to any part of the body or from the body of the depicted individual, or the depicted individual engaging in actual or simulated sexually explicit conduct.[6]  *Id.*

The same month that the NCII Statute was enacted, Elon Musk officially acquired Twitter for approximately $44 billion.  Subsequently, Musk-owned Twitter continued to permit content depicting nudity to be posted on its service and then disclosed by it.  Despite continued disclosure of content depicting nudity, Musk-owned Twitter was aware that it was disclosing NCII, including child sexual exploitation content.  For example, in an April 25, 2023, post to Twitter entitled 'An update on Twitter Transparency Reporting,' Musk-owned Twitter reported that over the first half of 2022, the company he would acquire just a few months later had suspended

---

[5] "Visual depiction" is a defined term in the NCII Statute and is as defined in 18 U.S.C. § 2256(5).  15 U.S.C. § 6851(a)(5).  Therefore, under the NCII Statute, a "visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

[6] "Sexually explicit conduct" is a defined term in the NCII Statute and is as defined in 18 U.S.C. § 2256(2)(A) & (B).  15 U.S.C. § 6851(a)(6).  Therefore, under the NCII Statute, "sexually explicit conduct" means actual or simulated sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex), bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the anus, genitals, or pubic area of any person.

16,670 accounts for and removed 115,226 items of non-consensual nudity, and suspended 691,704 accounts for and removed 11,927 items of child sexual exploitation. *See* **Exhibit 3**. In July 2023, Twitter was rebranded as X.  Subsequently, X continued to permit content depicting nudity to be posted on its service and then disclosed by it for users to view.  During this same time period, Musk announced the formation of a company called xAI, which was to be involved in the areas of artificial intelligence (AI) and social media.  In May 2024, X updated its policies to explicitly permit disclosure of consensually produced adult nudity or sexual behavior, including depictions of full or partial nudity, including genitals, buttocks or breasts, and explicit or implied sexual behavior.  X continues to permit this content to be posted and then disclosed on its service for users to view.  One current (2025) estimate suggests that X has over 586 million MAUs, and 245 million mDAUs, globally.

Plaintiff John Doe created an OnlyFans account. OnlyFans is a subscription-based platform in which creators create content for subscribers, or fans, to view.  An OnlyFans creator is a person who has set up their account to post content for a fan to view.  A fan is a person who has registered for an account, and who can access a creator's content.  A creator interaction is an interaction that grants a fan access to a creator's content.  The OnlyFans terms of service is a legally binding agreement for and between OnlyFans users, and registration and use of OnlyFans includes an agreement to be bound by its terms of service.  As a creator, John Doe agreed to the OnlyFans terms of service. Fans who view a creator's content agree to the OnlyFans terms of service.  Creator interactions are governed by the contract between fan and creator, which is legally binding and applies each time a creator interaction is initiated on OnlyFans. *See* **Exhibit 9**.

Content that John Doe created for his OnlyFans account included "intimate visual depictions," "sexually explicit conduct," and/or "commercial pornographic content" as defined

by the NCII Statute, depicting himself.  The content John Doe created for his OnlyFans account is his intellectual property.  Ripping is the act of copying content from a platform without the producer's, creator's, and/or platform's consent.  Copying content from a content creator violates the OnlyFans acceptable use policy and terms of service.  *See* **Exhibit 8**.  Intimate visual depictions, sexually explicit conduct, and/or commercial pornography, as defined in the NCII Statute, of John Doe were ripped from his OnlyFans account without his consent in violation of the OnlyFans terms of service.  John Doe created intimate visual depictions, sexually explicit conduct, and/or commercial pornography in reliance that a fan would comply with the OnlyFans acceptable use policy and terms of service.  John Doe consented to the creation of his intimate visual depictions that he created for OnlyFans but did not consent to the production[7] of his NCII derived from his consensual intimate visual depictions by virtue of misrepresentation or fraud nor the distribution or further disclosure of his intimate visual depictions beyond the OnlyFans creator interactions.  The Ripper misrepresented their willingness to comply with the acceptable use policy and terms of service to gain access to John Doe's intimate visual depictions and subsequently ripped those images and produced NCII from them and/or the Ripper fraudulently gained access to John Doe's intimate visual depictions and subsequently ripped those images and produced NCII from them.  Consequently, the NCII that was ripped from John Doe's OnlyFans

---

[7] The terms "production" and/or "produced" and the like have the meaning imparted onto them by 18 U.S.C. § 2257 (h) (2) which is incorporated into 15 U.S.C. § 6851 and states: (2) states: "the term "produces"**(A)**means
(**i**) actually filming, videotaping, photographing, creating a picture, digital image, or digitally- or computer-manipulated image of an actual human being;
(**ii**) digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, **publishing, duplicating, reproducing**, or reissuing a book, magazine, periodical, **film, videotape, digital image, or pictu**re, or other matter intended for commercial distribution, that **contains a visual depiction of sexually explicit conduct**; or
(**iii) inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content of a computer site or service that contains a visual depiction of, sexually explicit conduct;"***(Emphasis Added)*

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM

account was produced by fraud and/or misrepresentation. *See* **Exhibit 13**.

John Doe is also depicted in "Studio Pornography" which is commercial pornography that was produced by a studio – in this case by Falcon Studios, SayUncle, Pride Studios, and ASG Max. Each of the named studios granted viewers of its commercial pornography a limited license to view John Doe's intimate visual depictions in reliance that the viewer would comply with the studio's terms of service which forbid ripping and disclosing of the intimate visual depictions over a platform or website. *See* **Exhibits 10-12**. The Ripper misrepresented their willingness to comply with the terms of service to gain access to John Doe's intimate visual depictions and subsequently ripped those images and produced NCII from them and/or the Ripper fraudulently gained access to John Doe's intimate visual depictions and subsequently ripped those images and produced NCII from them. Consequently, the NCII that was ripped from studios' websites was produced by fraud and/or misrepresentation. Other Rippers ripped other studio commercial pornography from other studio websites, then also engaged in similar NCII production arising from misrepresentation or fraud relating to a violation of the relevant studios' terms of service in a manner similar to what John Doe and the class experienced. This content is also John Doe's intellectual property.

John Doe's NCII was ultimately posted to Twitter, and subsequently X, and then disclosed, as defined by the NCII Statute, by X to its users. The Ripper's inserting of John Doe's NCII on Twitter, and subsequently X, (which is a computer site or service) was a production[8] by misrepresentation because the Ripper misrepresented that they would comply with the terms of service of the studio site and/or the terms of service and acceptable use policy of OnlyFans which prohibits the production and/or the Ripper's inserting of John Doe's NCII on Twitter, and

---

[8] See FN 7

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM

subsequently X, (which is a computer site or service) was a production by fraud because the Ripper fraudulently entered into an agreement that they would comply with the terms of service of the studio site and/or the terms of service and acceptable use policy of OnlyFans which prohibits the production.  The disclosures of John Doe's NCII by X to its users was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce.  John Doe did not consent to the disclosure of his NCII by X. Twitter, and subsequently X, did not obtain John Doe's consent to disclose his intimate images on its platform. John Doe has reported NCII to X.  X knew that John Doe did not consent to disclosure of his intimate images on X.

Twitter, and subsequently X, disclosed John Doe's intimate image in a manner that recklessly disregards whether John Doe has not consented.  X states it has zero tolerance for child sexual exploitation.  X also acknowledges that sharing nonconsensual sexual images of someone without their consent is a severe violation of privacy, poses serious safety and security risks and can lead to significant physical, emotional and financial hardship for those affected.  Yet, despite this and despite permitting nudity and other sexually explicit images and behavior to be posted on its platform, and then subsequently disclosing it to users, before disclosing this content, X does not sufficiently verify the age(s) of the depicted individual(s), or, if the depicted individual(s) is an adult, obtain the adult depicted individual(s) consent to disclosure.  And, furthermore, X is aware that it is disclosing non-consensual intimate images and child sexual exploitation images (which is also NCII). For the first half of 2022, Twitter suspended 16,670 accounts for and removed 115,226 images of non-consensual nudity and suspended 691,704 accounts for and removed 11,927 images of child sexual exploitation.  *See* Exhibit 3.  Over the first half of 2024, X suspended 52,093 accounts for and removed 156,498 images of non-consensual nudity and suspended 2,781,634 accounts for and removed 14,571 images of child safety/child sexual

13

exploitation. *See* Exhibit 6.  Furthermore, regarding child sexual exploitation images, X reported 370,588 accounts to the National Center for Missing and Exploited Children ("NCMEC") for this period. *See* **Exhibit 7**.  Regarding non-consensual nudity, for second half of 2024 (as admitted by X in its publicly available "Transparency Report" (https://transparency.x.com/en/reports/global-reports/2025-transparency-report#non-consensual-nudity last visited on September 8, 2025), X suspended 51,449 accounts for NCII activity and removed 143,813 images of NCII.  *See* Attached Exhibit 2.  Regarding child sexual exploitation images (which is also NCII because a minor cannot consent to the creation of an intimate image of them or to the disclosure of same), the Transparency Report states that for the period May – December 2024, X suspended 1,790,852 accounts and removed 2,781 images.  *See* **Exhibit 1**. Furthermore, the Transparency Report states that, regarding child sexual exploitation images, X reported 313,917 accounts to the National Center for Missing and Exploited Children.  In fact, just within the past few weeks, a BBC News Investigation Report reported that a victim of child sexual abuse begged Elon Musk to stop links offering images of her abuse being posted on his social media platform X.  (www.bbc.com/news/articles/cq587wv4d5go, last visited September 8, 2025).

Despite the knowledge that it is disclosing non-consensual intimate images, including child sexual exploitation materials, X has not implemented measures to prevent disclosure of NCII. Despite the knowledge that it is disclosing non-consensual intimate images, including child sexual exploitation materials, X continues to do so without a meaningful system to verify the consent and age of depicted individuals. Twitter, and subsequently X, is, and was, willfully blind, and/or consciously avoided, and/or was deliberately indifferent, and/or reckless as to whether John Doe consented to X's disclosure of his intimate image(s). X acted in reckless disregard as to whether John Doe consented to disclosure of his intimate images on X.  Twitter, and

14

subsequently X, disclosed John Doe's intimate images, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce without John Doe's consent, knowing that John Doe did not consent to such disclosure(s) or in reckless disregard whether he consented to such disclosure(s), in violation of the NCII Statute and his intellectual property right(s).

During the same time period that Elon Musk rebranded Twitter to X (July 2023), Musk also announced the formation of a company called xAI, which was (and remains) involved in the areas of artificial intelligence (AI) and social media. In 2025, Musk, at the time the controlling shareholder in both X and xAI, announced that his company, xAI, acquired his company, X Corp., the developer of X. Reports at the time estimated that this business event doubled the combined value of Musk's stakes in both X (up to a 74% stake in X) and xAI (53% stake) from the value prior to the merger. Development of an artificial intelligence model like xAI includes training the model by feeding it data and content and thereby requires data sources. As evidenced by X's Terms of Service and public statements made by Musk, xAI was trained on the content of X. During this process, xAI used, and is continually using, the publicly available data that X has and is disclosing as its data source. One of the training aspects of an AI model like xAI is continuous learning, and xAI continually trains on the content of X by continuously using X as its data source. By using its content and data to train xAI, X disclosed, as defined by the NCII Statute, nonconsensual intimate images, including John Doe's, to xAI. The disclosures of John Doe's NCII by X to xAI was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce. John Doe did not consent to the disclosure of his NCII to xAI by X. X knew that John Doe did not consent to disclosure of his intimate image(s) to xAI by X, or recklessly disregarded whether he consented to such disclosure(s). X disclosed John Doe's intimate image(s) to xAI, in or affecting interstate or foreign commerce or using any

15

means or facility of interstate or foreign commerce, without John Doe's consent, knowing that John Doe did not consent to such disclosure(s) or in reckless disregard whether he consented to such disclosure(s), in violation of the NCII Statute, and in violation of his intellectual property right(s).  By merging X and xAI and making the decision to train xAI on the contents of X, X disclosed all of the non-consensual intimate images on X to xAI, and xAI induced the disclosure of all the non-consensual intimate images on X to xAI.  xAI is in possession of NCII, including John Doe's NCII.

Artificial intelligence is a rapidly evolving area, and with the "arms race" for top billing in the AI world playing out globally, proprietary information is hard to come by.  Upon information and belief, the most effective AI models are sophisticated systems that provide efficient mechanisms for the consumption of data and pathways for the transfer, as defined by the NCII Statute, of that data.  Upon information and belief, the data that X disclosed to xAI, including NCII, meets the definition of intimate visual depictions in the NCII Statute, because an intimate visual depiction includes data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.[9] Upon information and belief, this portion of the definition is how data, including images, consumed by artificial intelligence models like xAI, is transferred (a/k/a disclosed under the NCII Statute) among its own systems.

Upon information and belief, an artificial intelligence model, like xAI, needs somewhere to store all of the data that it has consumed, and is continuing to consume, as part of the training,

---

[9] Under the NCII Statute, "intimate visual depiction," includes usage as defined in 18 U.S.C. § 2256(5).  See 15 U.S.C. § 6851(a)(5).  Further, see 18 U.S.C. § 2256(5) for that statute's definition of "visual depiction."

refinement and evolution of the system.  To that end, upon information and belief, xAI uses cloud services for data storage, including but not limited to services from Amazon Web Services and Oracle Cloud.  In addition to third-party data storage services, upon information and belief, data centers have been built, are being built, and have been approved to be built for xAI data storage. Currently, xAI has data centers in Memphis, Tennessee and Atlanta, Georgia.  The data center in Memphis, for example, has been dubbed the Memphis Supercluster by Musk, or Colossus.  To expand its data centers, it has been reported that xAI is looking to rent data center space in Saudi Arabia from Humain, an AI company backed by the Saudi government's public investment fund. Domestically, it has been reported that xAI is looking at building a second data center in Memphis and has acquired a 1 million-square-foot property to do.

Upon information and belief, in order to store the massive amount of data it has received, and is receiving, xAI discloses and/or transfers data, as defined in the NCII Statute, which includes John Doe's NCII that was disclosed from X, to the cloud-based services it uses as well as its own data centers.  These transfers of NCII by xAI across its systems are disclosures, as defined in the NCII Statute.  The disclosures of John Doe's NCII by xAI was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce.  John Doe did not consent to the disclosure of his NCII by xAI, and xAI did not obtain John Doe's consent to disclose his intimate images on its platform.  xAI knew that John Doe did not consent to the disclosure of his NCII or xAI recklessly disregarded whether John Doe had not consented to such disclosures.  xAI disclosed John Doe's intimate images, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without John Doe's consent, knowing that John Doe did not consent to such disclosures or in reckless disregard whether he consented to such disclosures, in violation of the NCII Statute.

As xAI continues to collect data, it will continue to be in possession of NCII that X has

17

disclosed to it, and it will continue to disclose/transfer NCII across its systems. And, upon information and belief, as long as there is an xAI, it will continue to be vulnerable to attacks, hacking, and security breaches, leaving the NCII of John Doe, and countless other persons, vulnerable to disclosure.

## LEGAL ARGUMENT

**John Doe, on behalf of himself and all others similarly situated, is entitled to the entry of a Temporary Injunction, without notice**

15 U.S.C. § 6851 expressly permits courts to order equitable relief, including "a temporary restraining order, a preliminary injunction, or permanent injunction ordering the defendant to cease display or disclosure of the visual depiction." 15 U.S.C. § 6851(b)(3)(A)(ii). Several district courts have issued temporary restraining orders or preliminary injunctions in cases involving claims brought under 15 U.S.C. § 6851. *See Doe v. Sultan*, 2023 WL 7027976 (W.D.N.C. Oct. 25, 2023); *Doe v. Spencer*, 2023 WL 1484924 (M.D. Tenn. Feb. 2, 2023); *Doe v. Spencer*, 2023 WL 5153569 (M.D. Tenn. Jan. 11, 2023); *Doe v. Smith*, Case 2:24-cv-634-ES-JBC, United States District Court District of New Jersey, D.E. No. 24 and D.E. No. 49. Given the significant emotional and reputational harms, along with economic harms as well, which nonconsensual disclosure of intimate images can cause to its victims, plus the express provision in the NCII Statute permitting such relief, it can hardly be surprising that prior courts have granted injunctions.

The standard for issuing a temporary restraining order is largely identical to the standard for issuing a preliminary injunction. *See, i.e., Pablo Sequen v. Kaiser*, 2025 WL 2203419 at *2 (N.D. Cal. Aug. 1, 2025), citing *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017). A plaintiff seeking such relief must establish (1) that he or she is likely to succeed on the merits, (2) that he or she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that

18

the balance of equities tips in his or her favor, and (4) that an injunction is in the public interest. *Id.*, citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008).   If a plaintiff can only show that there are "serious questions going to the merits" – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the "balance of hardships tips sharply in the plaintiff's favor and the other two *Winter* factors are satisfied." *Id.*, citing *Alliance for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)); *see also Doe 4 v. Lyons*, 2025 WL 1208072 at *4, (W.D. Wash. April 25, 2025) (The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to which the first and third Winter factors are analyzed on a continuum; under such standard, a weaker showing on the merits, combined with a stronger determination on the balancing test, might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are met, citing *Alliance for the Wild Rockies*).

**There is a likelihood of success on the merits of this claim**

15 U.S.C. § 6851 permits a civil action relating to the nonconsensual disclosure of intimate images.  Under 15 U.S.C. § 6851(b)(1)(A), the cause of action exists for:

> An individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate foreign commerce, without the consent of the individual, where such disclosure was made by a person who knows that, or recklessly disregards whether, the individual has not consented to such disclosure, may bring a civil action against that person.

"Consent" means an affirmative, conscious and voluntary authorization made by the individual free from force, fraud, misrepresentation, or coercion. *Id.* at § 6851(a)(2).  Plaintiff has not consented to the disclosure of his intimate images by X, and the proposed class includes those that have likewise not consented to same.  Also, X  has recklessly disregarded whether the

Plaintiff has consented to the disclosure of his intimate images by it and has recklessly disregarded whether class members have consented to same.  Moreover, X knows it has a significant non-consensual nudity and child sexual exploitation (also known as Child Sexual Abuse Material) problem on its platform.  Regarding non-consensual nudity, for just the period May – December 2024, X suspended 51,449 accounts for and removed 143,813 images of NCII.  Regarding child sexual exploitation images, for the period May – December 2024, X suspended 1,790,852 accounts and removed 2,781 images. X also made over 300,000 reports to the National Center for Missing and Exploited Children about Child Sexual Abuse Material. In fact, as a real-world contemporaneous example, just this week, a BBC News Investigative Report reported that a victim of child sexual abuse has begged Elon Musk to stop links offering images of her abuse (which is NCII by definition) being posted on his X.  Despite the knowledge that it is disclosing, as defined by the NCII Statute, non-consensual intimate images, X has not implemented measures to prevent these non-consensual intimate image disclosures.  Despite the knowledge that it is disclosing non-consensual intimate images, X continues to do so without meaningful verification of consent and age of the depicted person.  Regarding xAI, Plaintiff has not consented to xAI possessing and transferring his NCII within its systems, and xAI has recklessly disregarded whether John Doe has consented to same.

Publishing, distributing, transferring or making accessible all constitute "disclosures" under this section.  *Id.* at § 6851(a)(4).  Through its platform, X has disclosed, as defined in the NCII Statute, Plaintiff's and class members' intimate images.  At a minimum, X is distributing and making accessible these images to its users on a continual basis.  Based on the decision made by Elon Musk to train xAI on the data of X, which included NCII, X disclosed and transferred NCII to xAI when xAI scraped all the data on X.   For its part, once acquired, xAI is in possession of NCII, and then transfers data, including the NCII it acquired from X, to other

20

networks to assist in AI implementation and for data storage purposes.

Plaintiff is a "depicted individual" under the statute because his "body appears in whole or in part in an intimate visual depiction" and he is "identifiable by virtue of [his] face, likeness or other distinguishing characteristic …," in the images that X discloses and xAI now possesses and transfers across its systems, and class members will be identifiable under the same standard. *Id.* at § 6851(a)(3).

An "intimate visual depiction" is any photo, video, or other visual image[10] that depicts "the uncovered genitals, pubic area, anus or post-pubescent female nipple," of an identifiable individual, or "the display or transfer of sexual fluids" on to the body or from the body of an identifiable individual, or an identifiable individual engaged in "sexually explicit conduct."  *Id.* at § 6851(a)(5)(A)(i) and (ii).  The nonconsensual images, visual depictions (including GIFS and similar visual depictions), and videos at issue in this matter, for Plaintiff individually and for all similarly situated class members, all fit the definition of "intimate visual depiction(s)" under the statute as disclosed by X, and that xAI now possesses and transfers.

Disclosure of these images on X constitutes "in or affecting interstate or foreign commerce."  *See, i.e., U.S v Runyan*, 290 F.3d 223, 239 (5th Cir. 2002), *U.S. v. Carroll*, 105 F.3d 740, 742 (1st Cir. 1997) (Transmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce.).  The transfer of these images among its systems by xAI are "in or affecting interstate or foreign commerce."

Liability under 15 U.S.C. § 6851 for a platform like X for content that a third-party initially posts, and then the platform discloses to users, exists in this matter because this is (1) a

_____

[10] See also 18 U.S.C. § 2256(5).

claim based on an established intellectual property right brought under a statute that pertains to intellectual property (§ 6851), where the statute's subject matter is germane, and/or connected to, and/or related to the claim, and/or (2) § 6851 displaces any immunity or limitation of liability afforded  X because it is a later-enacted and more specific law.

While [movant] carries the burden of demonstrating likelihood of success, [movant] is not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek. *Alcantara v. Archambeault*, 462 F.Supp.3d 1073, 1077 (S.D. Cal. May 26, 2020) (citing *Univ. of Texa v. Camenisch*, 451 U.S. 390, 395 (1981)).  Plaintiff has demonstrated a substantial likelihood of success on the merits of his claim vs X and has demonstrated why equitable relief against xAI should also be granted.

**Plaintiff and Class Members will suffer irreparable harm absent an injunction**

The injuries and harms, including emotional, reputational, and economic, that a victim of the nonconsensual disclosure of his or her intimate images suffer can be significant, especially once disclosed on a platform like X where the images will remain for anyone to see unless and until X is ordered to cease display.  Continuing to permit display and disclosure of these images without consent is the very definition of irreparable harm should the images continue to be disclosed by X.

Regarding X, the nonconsensual disclosure of intimate images is a crime in most states and is now a federal crime as well.  Criminalization of this behavior, essentially across the United States, is an objective recognition of the harm that nonconsensual disclosure of a person's intimate images causes to its victims.

Subjectively, victims of nonconsensual disclosure of intimate images can suffer emotional, economic, and reputational harms, and continuing to permit display and disclosure by X instead of requiring X to immediately cease display and disclosure will continue to compound

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM

these harms.  The non-consensual dissemination of intimate images (NCII) is a form of technology-facilitated, image-based sexual abuse.  Mclocklin, G., Kellezi, B., Stevenson, C., & Mackay, J. (2024).  Disclosure Decisions and Help-Seeking Experiences Amongst Victim-Survivors of Non-Consensual Intimate Image Distribution.  *Victims & Offenders*, 1-27. https://doi.org/10.1080/15564886.2024.2329107. An emerging, and concerning, problem in this social media age, there is limited research examining the risk factors associated with nonconsensual distribution of intimate images (NCII) victimization.  Brighi, A., Amadori, A., Summerer, K., & Menin, D. (2023).  Prevalence and risk factors for nonconsensual distribution of intimate images among Italian young adults: Implications for prevention and intervention, *International Journal of Clinical and Health Psychology*, 23:4, 1-10. https://doi.org/10.1016/j.ijchp.2023.100414. Many current studies focus on the impact of the nonconsensual disclosure of intimate images on youth, which suggests increased depression, anxiety and suicidal ideation in young people following nonconsensual disclosure.  Schmidt, F., Varese, F., Larkin, A., & Bucci, S. (2024). The Mental Health and Social Implications of Nonconsensual Sharing of Intimate Images on Youth: A Systematic Review; *Trauma, Violence & Abuse*, 25:3, 2158-2172.  https://doi.org/10.1177/15248380231207896.

Courts have also written about harms associated with distribution of nonconsensual intimate images.  And while this dicta is in the context of child pornography cases, the emotional harms described can be analogous when it comes to nonconsensual disclosures for adults.

The Supreme Court has long recognized [that the government has a compelling interest in protecting minors from becoming victims of child pornography] ***because of the physiological, reputational and emotional harm that distribution of such material imposes*** [on them].  *U.S. v Hotaling*, 634 F.3d 725, 728 (2nd Cir. 2011), citing *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 249 (2002) (***emphasis added***).  The Supreme Court has also recognized that [minors] are harmed

[not only during the creation of child pornography] but are also *haunted for years by the knowledge of its continued circulation*.  *Id.*, citing *New York v. Ferber*, 458 U.S. 747, 759 n.10 (1982) (*emphasis added*).  These *emotional and reputational harms are severe enough to render laws criminalizing* [the possession of child pornography] constitutional in the interest of stamping out this vice at all levels in the distribution chain. *Id.* at 728-729 (*emphasis added*).  Nonconsensual images being disclosed on X create a "lasting record," and victims are "thus victimized every time the [image] is displayed."  *U.S. v. Anderson*, 759 F.3d 891, 894-895 (8th Cir. 2014).

Regardless of a person's age, any nonconsensual disclosure of an individual's intimate images has obvious potential for irreparable harm.  Continual disclosure(s) of an individual's nonconsensual intimate images on a worldwide platform like X has the obvious potential to exponentially compound the irreparable harm for Plaintiff and class members.   Plaintiff has demonstrated irreparable harm on behalf of himself and class members should this relief be denied.

Regarding xAI, an AI models' vulnerability to attacks and hacking are an illustration as to how having NCII in xAI's system could result in harm should this injunction not be granted as to xAI.  For example, recently, a federal government employee with the Department of Government Efficiency (DOGE) accidentally uploaded xAI credentials to GitHub, which according to the article, raised major questions about access control, data security, and the growing use of AI.  Researchers who discovered the leak were able to confirm its validity before the repository was taken down, but not before it could have been scrapped by others.  (https://www.yahoo.com/news/leaked-xai-security-key-could-212458874.html last accessed on September 9, 2025.) The leaking of a fundamental security key by Marko Elez (a former X employee and Elon Musk associate) is not the only publicly known example of an employee

24

associated with Elon Musk jeopardizing the safety of xAI and its data. As reported by The Guardian, "Elon Musk's artificial intelligence company has blamed an "unauthorized modification" for a glitch in its Grok chatbot that resulted in the tool ranting about "white genocide" in South Africa." (https://www.theguardian.com/technology/2025/may/16/elon-musks-ai-firm-blames-unauthorised-change-for-chatbots-rant-about-white-genocide last accessed on September 9, 2025). As CNN reports, "a "rogue employee was behind Grok's unprompted "white genocide" mentions." (https://edition.cnn.com/2025/05/16/business/a-rogue-employee-was-behind-groks-unprompted-white-genocide-mentions last accessed on July 30, 2025). Grok is an AI chatbot that is powered by xAI and is imbedded in X. This means that attacks on X could also impact xAI, and vice versa. In another example of a data breach/ leak that was caused by an Elon Musk/X/xAI associated employee, as reported by Newsweek, "the largest social media data breach ever, which allegedly leaked information linked to more than 2.8 billion accounts on X… stems from a 400Gb trove of user data said to have been exfiltrated by a disgruntled employee during mass layoffs at X following Musk's 2022 acquisition of the company.." (https://www.newsweek.com/twitter-x-elon-musk-data-breach-2054012, last visited September 9, 2025). Current and former employees or associates of Elon Musk are not the only threat actors causing data breaches at X and xAI. Indeed, as The Guardian has reported, "Elon Musk claimed on Monday afternoon that X was targeted in a "massive cyber-attack"…. "We get attacked every day, but this was done with a lot of resources," the platform's CEO posted. "Either a large, coordinated group and/or a country is involved." (https://www.theguardian.com/technology/2025/mar/10/elon-musk-cyberattack-x-outages last accessed September 9, 2025). As is made obvious by the above, Elon Musk is incapable of securing X's and xAI's data from internal and external threat actors and this sampling of documented vulnerabilities underscores the irreparable harm John Doe faces should X and xAI

25

be allowed to keep his NCII in their systems and/or continue to disclose it.

**The balance of equities tips sharply in Plaintiff's, and Class Member's, favor**

The threat of continuing harm to Plaintiff and class members is significant (see above section).  Objectively, legislators have recognized the potential for harm by not only criminalizing the nonconsensual disclosure of intimate images and creating a federal civil cause of action for it, but by also explicitly permitting courts in § 6851 claims to order equitable relief like a temporary restraining order or preliminary injunction to cease disclosure of the visual depiction.  *See* 15 U.S.C. § 6851(b)(3)(A)(ii).  In creating this cause of action, the legislature realized that liquidated monetary damages alone for the nonconsensual disclosure of intimate images was an incomplete remedy to fully protect victims and make them whole for a tortfeasor's violation of this statute.  Explicit inclusion of the availability of such equitable relief in § 6851 actions is surely a recognition that the hardships for nonconsensual disclosures of intimate images are all on the Plaintiff's side. On the other hand, what unfairness or hardship could the Defendants claim for being prevented from continuing to do something (disclose intimate images without the depicted person's consent or in reckless disregard to whether the depicted person did not consent) that violates a federal statute, and many states have criminalized?  An injunction prohibiting the Defendants from engaging in tortious conduct of the nature at issue, or at a minimum requiring them to obtain age and consent verification before disclosing an intimate visual depiction, would cause no harm to it.  Thus, the balance of hardships weighs heavily and sharply, if not entirely, in Plaintiff's, and Class Member's, favor.

**Granting injunctive relief is in the public interest**

Consent is a critical prerequisite to many aspects of human life, and it is one that must be honored.  When consent is required for an action to occur, the public interest is always served when consent is first obtained. This is practically true when consent is contemplated in

26

relationship to intimate images and videos which are the most special and personal type of intellectual property.  Moreover, it is of the upmost importance to the public interest to remove (and prevent) child sexual exploitation images from begin disclosed in the public domain, period.  Conversely, there would be no harm to the public interest if, in viewing intimate images and sexually explicit behavior on X, that X has confirmed for users that the depicted individuals are of age and have consented to having their intimate images displayed, and that X has taken those confirming steps.

Regarding the duration of X's NCII violations, Musk-owned Twitter and X have been disclosing NCII – with knowledge – since Musk purchased and took control of Twitter and the NCII Statute was enacted (both circa October 2022).  In terms of the (reported) magnitude of X's NCII violations, in 2024 alone, as per its own Transparency Report, X suspended over 100,000 accounts for and removed 300,000 images of non-consensual nudity and suspended nearly 4.6M accounts for and removed over 17,000 child sexual exploitation images.   And if it wasn't obvious from these reported figures, for good measure, the aforementioned BBC Investigative Report noted that "the scale of the problem is enormous."  Having X cease display and disclosure of NCII is well overdue, and curtailing this reckless behavior as Plaintiff suggests herein is in the public interest.

**The security requirement should be waived**

Plaintiff respectfully requests that the security requirement in Rule 65(c), *Fed.R.Civ.P.* be waived.  At least one district court presiding over a § 6851 claim has required no security pursuant to a request for injunction.  *See Doe v. Sultan*, 2023 WL 7027976 at *2 (W.D.N.C. Oct. 25, 2023).

The rule provides that the movant gives security in an amount the court considers proper for payment of costs and damages sustained by the adverse party if the adverse party is

wrongfully enjoined.  Rule 65(c), *Fed.R.Civ.P*.  Despite the seemingly mandatory language, "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (*italicized in opinion*).  In particular, "[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

In this instance, there would be no costs or damages sustained by the Defendants (*i.e.*, no harm) if it turned out that enjoining them from disclosing NCII and requiring age and consent verification before re-disclosing or disclosing intimate images anew, was incorrect.  There is no risk of monetary loss to them if these images are enjoined from disclosure since, for example, users of X are not paying to specifically view these images.  Rather, viewing NCII images is a by-product of simply being on X; there is no additional cost incurred by a user for access to these images, and therefore, there would be no monetary loss, or even potential for monetary loss, for X even if NCII was incorrectly removed under this motion.  The same would be true for xAI, as the images are simply sitting in xAI's system, and other systems that these images were transferred to by xAI.  If the purpose of requiring a bond is to account for possible costs and damages in the event of improper enjoinment, but there would be no cost(s), damage(s), or harm suffered by a Defendant if improper enjoinment occurred, it follows then that if the bond would serve no purpose, then it should be waived.

Alternatively, (*in arguendo*) given the illegal nature of NCII, even if X and xAI profited from NCII disclosures (and therefore could theoretically argue it would suffer monetary losses in the event of improper enjoinment) then that "lost income" would represent an unjust enrichment for which X or xAI should have no legal right to.  For example, in aforementioned Deferred Prosecution Agreement resulting from *United States v. Aylo Holdings S.A.R.L., Case No.* 1:23-cr-00463, United States District Court for the Eastern District of New York, Pornhub's parent

28

company agreed to pay $1,844,952.82 to the United States, and additional monetary payments to their victims, due to conduct tantamount to profiting from NCII. Regarding "unjust enrichment" California permits a cause of action for it. *See Russell v. Walmart, Inc.*, 680 F.Supp.3d 1130, 1132-33 (N.D. Cal. July 5, 2023) (recent authority confirms that both the Ninth Circuit and the California Supreme Court construe California law to permit a cause of action for unjust enrichment). To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense. *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016). Any monetary benefit obtained by X and xAI for disclosing Plaintiff's and Class Member's NCII would qualify as an unjust enrichment. Therefore, under California-based unjust enrichment principles, it would be inequitable in this instance to require the Plaintiff to post a bond equivalent to potential monetary "losses" "suffered" by X or xAI in the event of each was wrongfully enjoined given that X and xAI have "unjustly enriched" themselves through disclosure of the very NCII that this injunction seeks to address.

**Plaintiff should be permitted to proceed under a pseudonym**

This "preservation of anonymity" is permitted by 15 U.S.C. § 6851(b)(3)(B) for this claim.

/

/

/

/

/

/

/

29

**CONCLUSION**

The temporary restraining order, without notice, should be granted because immediate and irreparable injury and harm will (continue to) result to Plaintiff and class members should the court not grant this request.   Plaintiff has strictly complied with all conditions of Rule 65(b)(1), *Fed.R.Civ.P.*

DATED: September 9, 2025                    ALTAIR LAW LLP &

                                           SEARCY DENNEY SCAROLA BARNHART &
                                           SHIPLEY P.A.

                                                   **/s/ Craig M. Peters**
                                           By: _____
                                               CRAIG M. PETERS
                                               Attorneys for Plaintiff JOHN DOE

                                                   **/s/ T. Hardee Bass, III**
                                           By: _____
                                               T. HARDEE BASS, III
                                               Attorneys for Plaintiff JOHN DOE

John Doe, Individually & on behalf of all others similarly situated vs. X CORP. and X.AI CORP.
Case No. 3:25-CV-07597
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR (1) TEMPORARY RESTRAINING ORDER WITHOUT NOTICE, (2) PRELIMINARY INJUNCTION & ORDER TO SHOW CAUSE SETTING HEARING, AND (3) ORDER PERMITTING PLAINTIFF TO PROCEED UNDER PSEUDONYM