## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JOHN DOE, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>X CORP., (f/k/a Twitter, Inc., d/b/a X), and X.AI CORP., (d/b/a xAI)<br><br>    Defendants. | Civil Action No. 4:25-cv-01282-P<br><br>**AMENDED COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

## INTRODUCTION

1. The right to control the bounds of the disclosure of one's intimate visual depiction is a well-established intellectual property right.  Yet this right is recklessly violated by X (formerly Twitter) through the nonconsensual disclosure of identifiable individuals' intimate images (**hereinafter "NCII"**), including intimate images of minors and child sexual exploitation images.

2. In October 2022, 15 U.S.C. § 6851 (**hereinafter the "NCII Statute"**)[1] was enacted to provide victims (which includes minors because a minor cannot consent to the creation or disclosure of an intimate image of themselves) of NCII a civil remedy for the non-consensual disclosure of intimate images.  This is a claim being brought pursuant to the NCII Statute, and it seeks to address, correct, and hold X and xAI accountable for their nonconsensual disclosure of these images, and do justice – not just in the form of liquidated monetary damages as the NCII Statute provides, but equitable relief in the form of a temporary restraining order and/or

---

[1] Emphasis added on initial mentions because "NCII" and the "NCII Statute" will be referenced often throughout this complaint.

preliminary injunction enjoining the defendants from displaying or disclosing the Plaintiff's and class members' NCII as the NCII Statute also provides – for the untold numbers of victims of this extremely reckless behavior that causes immense irreparable harm.

## JURISDICTION

3. This is an action brought pursuant to 15 U.S.C. § 6851 ("NCII Statute") for liquidated damages and equitable relief based on the nonconsensual disclosure of Plaintiff's, and others', intimate images ("NCII") by Defendants X (formerly Twitter) and xAI.  The United States District Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves a federal question arising under 15 U.S.C. § 6851.

## PARTIES AND VENUE

4. John Doe[2] is a resident of Las Vegas, Nevada.

5. Defendant X Corp., f/k/a Twitter, Inc. (hereinafter "Twitter"), d/b/a X (hereinafter referred to as "X"), was incorporated in Nevada in March 2023.  Upon incorporation, its principal business address was in San Francisco, California.  In April 2023, X Corp. registered to do business in California, under the name X Corp. doing business in California as, X Corp., a Nevada Corporation.  Its principal business address remained in San Francisco, California, and it had a registered agent in California.  As of September 2024, X Corp.'s principal business address is in Bastrop, Texas.  Despite changing principal business addresses, X Corp. remains actively registered to do business in California and maintains a registered agent in Los Angeles County, California, for service of process. In addition, X engages in continuous and systematic activity in California and did so during all times relevant to this action.  X discloses, as defined in the NCII Statute, NCII to users all over the world, in all 50 states, and therefore has committed tortious acts

---

[2] Pursuant to 15 U.S.C. § 6851(A)(3)(B), Plaintiff has filed this action using a pseudonym to protect his identity and is requesting the Court grant the equitable relief.

pursuant to the NCII Statute in California and did so during all times relevant to this action. Upon information and belief, X has company offices in Los Angeles, San Jose and Palo Alto, California. On or about March 27, 2025, X became a wholly owned subsidiary of xAI. On or about March 27, 2025, X may have also become a wholly owned subsidiary of X.AI Holdings Corp. Prior to July 2023, X was known as Twitter, Inc. Twitter was incorporated in Delaware in 2007, and upon incorporation its principal business office was in San Francisco, California. In July 2007, Twitter registered to do business in California. During all times relevant to this action, Twitter's principal business address was in San Francisco, California.

6. Defendant X.AI Corp., d/b/a as xAI (hereinafter referred to as "xAI"), was incorporated in Nevada in March 2023. Upon incorporation, its principal business address was in Burlingame, California. In April 2023, xAI registered to do business in California, under the name X.AI Corp. Its principal business address remained in Burlingame, California. As of April 2025, its principal business address is in Palo Alto, California. xAI remains actively registered to do business in California and maintains a registered agent in Sacramento County, California for service of process. In addition, xAI engages in continuous and systematic activity in California and did so during all times relevant to this action. xAI is in possession of NCII which was disclosed to it from X, and transfers and/or otherwise discloses NCII between servers or other infrastructure of xAI. On or about March 27, 2025, xAI acquired Defendant X. Corp.

7. Venue is most proper in the Northern District of California under 28 U.S.C. § 1391(B) and (C). Furthermore, Twitter and X User Agreements in place during the relevant time period of this claim – October 1, 2022 – November 14, 2024 – set venue solely in the federal or state courts

located in San Francisco County, California, serving as a bilateral agreement to personal jurisdiction in the Northern District of California.[3]

## **RELEVANT LAW**

8. This claim is being brought pursuant to 15 U.S.C. § 6851, the NCII Statute, which provides for a civil cause of action for the nonconsensual disclosure of an individual's private intimate images, or NCII.

9. The NCII Statute cause of action is for:

> An individual whose intimate visual depiction is disclosed, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without the consent of the individual, where such disclosure was made by a person who knows that, or recklessly disregards whether, the individual has not consented to such disclosure

10. The NCII Statute defines "disclosure" as to transfer, publish, distribute, or make accessible and the use of the word "disclosure," "disclose," "disclosed," or "disclosing" in this complaint has the meaning imparted upon it by the statute.

## **GENERAL FACTUAL ALLEGATIONS**

11. X, formerly known as Twitter, is a social networking service where users can post text, images and videos.

---

[3] Plaintiff's initial Complaint (ECF No. 1) was filed September 6, 2025, sought damages from October 1, 2022 – present. Defendants filed a Motion to Transfer Venue (ECF No. 24) based primarily on the current X Terms of Service (version 20), which became effective November 15, 2024, and contained a venue clause for disputes to be brought in the Northern District of Texas or state courts located in Tarrant County, Texas, and the Court granted the motion based on it (ECF No. 40). As set forth in Plaintiff's Opposition to the Motion to Transfer (ECF No. 31), prior versions of the X ToS contained venue clauses for disputes to be brought in the state or federal courts of San Francisco County, California. Plaintiff maintains that the Northern District of California is the appropriate venue for this action. Moreover, this Amended Complaint limits the claim period from October 1, 2022 – November 14, 2024, which predates the current X ToS (which is the version that sets venue in this District). As such, as will be more fully explained in Plaintiff's Response to the Court's Order regarding venue briefing (ECF No. 43), venue is more appropriate in the Northern District of California, and the case should be transferred back to that District.

12. These posts are then disclosed, as defined in the NCII Statute,[4] by X to the public and users of the platform.

13. Launched in 2006, by 2022, Twitter had hundreds of millions of daily active users ("DAUs") and monetizable daily active users ("mDAUs") globally.

14. A DAU is the count of users who perform a certain action on a platform every single day, a mDAU is a DAU who also makes a purchase or transaction within a specific time frame, and a MAU is a monthly active user.

15. As of the second quarter of 2022, Twitter boasted 238 million mDAUs globally.

16. During this time, Twitter was one of the few major social media platforms that allowed content depicting nudity to be posted on its service and then disclosed by it.

17. While it continued disclosing content depicting nudity, Twitter was aware that it was disclosing NCII, including child sexual exploitation content.

18. For example, over the first half of 2018, Twitter suspended a total of 487,363 accounts for violations related to child sexual exploitation.  And over the first half of 2019, Twitter suspended 244,188 accounts for violations related to child sexual exploitation.

19. By October 2022, nudity constituted an estimated 13% of the content being disclosed by Twitter.

20. On October 1, 2022, a federal civil cause of action relating to the nonconsensual disclosure of an individual's intimate image was created under 15 U.S.C. § 6851(the NCII Statute).

21. Prohibited from disclosure without the depicted individual's consent, or in reckless disregard as to whether the depicted individual did not consent, is a visual depiction of the uncovered genitals, pubic area, anus, or post-pubescent female nipple, the display or transfer of

---

[4] Its use throughout is as defined in the NCII Statute.

bodily sexual fluids onto any part of the body or from the body of the depicted individual, or the depicted individual engaging in actual or simulated sexually explicit conduct.[5]

22. The same month that the NCII Statute was enacted, Elon Musk officially acquired Twitter for approximately $44 billion.

23. Subsequently, Musk-owned Twitter continued to permit content depicting nudity to be posted on its service and then disclosed by it.

24. Despite continued disclosure of content depicting nudity, Musk-owned Twitter was aware that it was disclosing NCII, including child sexual exploitation content.

25. For example, in an April 25, 2023 post to Twitter entitled 'An update on Twitter Transparency Reporting,' Musk-owned Twitter reported that over the first half of 2022, the company that he would officially acquire just a few months later had suspended 16,670 accounts for and removed 115,226 items of non-consensual nudity, and suspended 691,704 accounts for and removed 11,927 items of child sexual exploitation.

26. In July 2023, Twitter was rebranded as X.

27. Subsequently, X continued to permit content depicting nudity to be posted on its service and then disclosed by it for users to view.

28. During this same time period, Musk announced the formation of a company called xAI, which was to be involved in the areas of artificial intelligence (AI) and social media.

---

[5] "Sexually explicit conduct" is a defined term in the NCII Statute and is as defined in 18 U.S.C. § 2256(2)(A) & (B). 15 U.S.C. § 6851(A)(6). Therefore, under the NCII Statute, "sexually explicit conduct" means actual or simulated sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex), bestiality, masturbation, sadistic or masochistic abuse, or lascivious exhibition of the anus, genitals, or pubic area of any person.

29. In May 2024, X updated its policies to explicitly permit disclosure of consensually produced adult nudity or sexual behavior, including depictions of full or partial nudity, including genitals, buttocks, or breasts, and explicit or implied sexual behavior.

30. Up to November 14, 2024, X continued to permit this content to be posted and then disclosed on its service for users to view.

31. One current (2025) estimate suggests that X has over 586 million MAUs, and 245 million mDAUs, globally.

32. John Doe created an OnlyFans account.

33. OnlyFans is a subscription-based platform in which creators create content for subscribers, or fans, to view.

34. An OnlyFans "creator" is a person who has set up their account to post content for a fan to view. A "fan" is a person who has registered for an account and who can access a creator's content. A "creator interaction" is an interaction that grants a fan access to a creator's content.

35. The OnlyFans terms of service is a legally binding agreement for and between OnlyFans users, and registration and use of OnlyFans includes an agreement to be bound by its terms of service.

36. As a creator, John Doe agreed to the OnlyFans terms of service.

37. Fans who view a creator's content agree to the OnlyFans terms of service.

38. Creator interactions are governed by the contract between fan and creator, which is legally binding and applies each time a creator interaction is initiated on OnlyFans.

39. Content that John Doe created for his account included "intimate visual depictions," "sexually explicit conduct" and/or "commercial pornographic content" as defined by the NCII Statute, depicting himself.

40. The content John Doe created for his OnlyFans account is his intellectual property.

41. "Ripping" or to "Rip" (past tense "Ripped") is the act of copying content from a platform without the producer's, creator's, or platform's consent.

42. One who "Rips" content is a "Ripper"

43. Copying, or ripping, content from a content creator violates the OnlyFans acceptable use policy and terms of service.

44. Intimate visual depictions, sexually explicit conduct, and/or commercial pornography, as defined in the NCII statute, of John Doe were "ripped" from his OnlyFans account without his consent in violation of the OnlyFans terms of service.

45. John Doe created intimate visual depictions, sexually explicit conduct, and/or commercial pornography in reliance that a fan would comply with the OnlyFans acceptable use policy and terms of service.

46. John Doe consented to the creation of his intimate visual depictions that he created for OnlyFans but did not consent to the production of his NCII derived from his consensual intimate visual depictions by virtue of misrepresentation or fraud nor the distribution or further disclosure of his NCII beyond OnlyFans creator interaction(s).

47. The Ripper misrepresented their willingness to comply with the acceptable use policy and terms of service to gain access to John Doe's intimate visual depictions and then in violation of those agreements ripped those intimate images and produced[6] NCII by misrepresentation from

---

[6] 18 U.S.C. § 2257 is incorporated by reference into 15 U.S.C. § 6851, and 18 U.S.C. § 2257 (H) (2) states: "the term "produces"[6](**A**)means - **(i)** actually filming, videotaping, photographing, creating a picture, digital image, or digitally-or computer-manipulated image of an actual human being; **(ii)** digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, publishing, **duplicating, reproducing**, or reissuing a book, magazine, periodical, **film, videotape, digital image, or pictu**re, or other matter intended for commercial distribution, that **contains a visual depiction of sexually explicit conduct**; or (iii)inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content of a computer site or service that contains a visual depiction of, sexually explicit conduct;" *(Emphasis Added)*

them and /or the Ripper fraudulently gained access to John Doe's intimate visual depictions and then in violation of those agreements ripped those intimate images and fraudulently produced NCII from them.

48. Consequently, the NCII that was ripped from John Doe's OnlyFans account was produced by fraud and/or misrepresentation.

49. John Doe is also depicted in "Studio Pornography" which is commercial pornography that was produced by a studio – in this case by Falcon Studios, SayUncle, Pride Studios, and ASG Max.

50. Each of the named studios granted viewers of its commercial pornography a limited license to view John Doe's intimate visual depictions in reliance that the viewer would comply with the studio's terms of service which forbid ripping and disclosure of the intimate visual depictions over a platform or website.

51. The Ripper misrepresented their willingness to comply with the studio's terms of service to gain access to John Doe's intimate visual depictions and subsequently, in violation of those agreements, ripped those images and produced NCII by misrepresentation from them and/or the Ripper fraudulently gained access to John Doe's intimate visual depictions and subsequently, in violation of those agreements, ripped those images and fraudulently produced NCII from them.

52. Consequently, the NCII that was ripped from studios' websites was produced by fraud and/or misrepresentation.

53. Other Rippers ripped other studio commercial pornography from other studio websites then also engaged in similar NCII production arising from a misrepresentation or fraud relating to a violation of the relevant studios' terms of service in a manner similar to what John Doe and the class experienced.

54. This content is also John Doe's intellectual property.

55. John Doe's NCII was ultimately posted to Twitter, and subsequently X, and then disclosed, as defined by the NCII Statute, by X to its users from October 1, 2022, to November 14, 2024.

56. The Ripper's inserting of John Doe's NCII on Twitter, and subsequently X, (which is a computer site or service) was a production[7] by misrepresentation because the Ripper misrepresented that they would comply with the terms of service of the studio site and/or the terms of service and acceptable use policy of OnlyFans which prohibits that production and/or the Ripper's inserting of John Doe's NCII on Twitter, and subsequently X, (which is a computer site or service) was a production by fraud because the Ripper fraudulently entered into an agreement that they would comply with the terms of service of the studio site and/or the terms of service and acceptable use policy of OnlyFans which prohibits that production.

57. From October 1, 2022, to November 14, 2024, the disclosures of John Doe's NCII by X to its users was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce.

58. Between October 1, 2022, to November 14, 2024, John Doe did not consent to the disclosure of his NCII by X.

59. Between October 1, 2022, to November 14, 2024, Twitter, and subsequently X, did not obtain John Doe's consent to disclose his intimate images on its platform.

---

[7] 18 U.S.C. § 2257 is incorporated by reference into 15 U.S.C. § 6851, and 18 U.S.C. § 2257 (H) (2) states: "the term "produces"[7](**A**)means - **(i)** actually filming, videotaping, photographing, creating a picture, digital image, or digitally- or computer-manipulated image of an actual human being; **(ii)** digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, publishing, duplicating, reproducing, or reissuing a book, magazine, periodical, film, videotape, digital image, or picture, or other matter intended for commercial distribution, that contains a visual depiction of sexually explicit conduct; or (iii)**inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content of a computer site or service that contains a visual depiction of, sexually explicit conduct**;" *(Emphasis Added)*

60. John Doe has reported NCII to X.

61. From October 1, 2022, to November 14, 2024, Twitter, and subsequently X knew that John Doe did not consent to disclosure of his intimate images on X.

62. From October 1, 2022, to November 14, 2024, Twitter, and subsequently X, disclosed John Doe's NCII in a manner that recklessly disregards whether John Doe has not consented.

63. X states it has zero tolerance for child sexual exploitation.

64. X also acknowledges that sharing nonconsensual sexual images of someone without their consent is a severe violation of privacy, poses serious safety and security risks and can lead to significant physical, emotional and financial hardship for those affected.

65. Yet, despite this and despite permitting nudity and other sexually explicit images and behavior to be posted on its platform, and then subsequently disclosing it on its service for users to view, before disclosing this content, X does not sufficiently verify the age(s) of the depicted individual(s), or, if the individual is an adult, obtain the adult individual's consent to disclosure.

66. And, furthermore, X is aware that it is disclosing NCII, including non-consensual nudity, non-consensual sexually explicit content, and child sexual exploitation images.

67. For the period January – June 2022, Twitter suspended 16,670 accounts for and removed 115,226 images of non-consensual nudity and suspended 691,704 accounts for and removed 11,927 images of child sexual exploitation.

68. For the period January – June 2024,[8] X suspended 52,093 accounts for and removed 156,498 images of non-consensual nudity and suspended 2,781,634 accounts for and removed 14,571 images of child safety/child sexual exploitation.

---

[8] Upon information and belief Musk-owned Twitter/X did not release a Transparency Report for 2023, though the Twitter H1 2022 statistics were reported by Twitter/X in April 2023 after Musk acquired it.

69. Furthermore, regarding child sexual exploitation images, X reported 370,588 accounts to the National Center for Missing and Exploited Children ("NCMEC") for this period.

70. For the period May – December 2024, X suspended 51,449 accounts for and removed 143,813 images of non-consensual nudity and suspended 1,790,852 accounts for and removed 2,781 images of child sexual exploitation.

71. Furthermore, regarding child sexual exploitation images, X reported over 300,000 accounts to the NCMEC for this period.

72. In fact, just last week, a BBC News Investigation Report reported that a victim of child sexual abuse has begged Elon Musk to stop links offering images of her abuse being posted on his social media platform X.

73. Despite the knowledge that it was disclosing non-consensual intimate images, between October 1, 2022, and November 14, 2024, X did not implement measures to prevent the disclosure of non-consensual intimate images.

74. Despite the knowledge that it was disclosing non-consensual intimate images, between October 1, 2022, and November 14, 2024, X continued to do so without a meaningful system to verify the consent and age of depicted individuals.

75. From October 1, 2022, to November 14, 2024, Twitter, and subsequently X, was willfully blind, and/or consciously avoided, and/or was deliberately indifferent, and/or reckless as to whether John Doe consented to X's disclosure of his intimate images on X.

76. From October 1, 2022, to November 14, 2024, X acted in reckless disregard as to whether John Doe consented to the disclosure of his intimate images on X.

77. From October 1, 2022, to November 14, 2024, Twitter, and subsequently X, disclosed John Doe's intimate images, in or affecting interstate or foreign commerce or using any means or

facility of interstate or foreign commerce, without John Doe's consent, knowing that John Doe did not consent to such disclosures or in reckless disregard whether he consented to such disclosures, in violation of the NCII statute, and violation of his intellectual property right(s).

78. During the same time period that Elon Musk rebranded Twitter to X (July 2023), Musk announced the formation of a company called xAI, which was (and remains) involved in the areas of artificial intelligence (AI) and social media.

79. In 2025, Musk, at the time the controlling shareholder in both X and xAI, announced that his company, xAI, acquired his company, X Corp., the developer of X.

80. Reports at the time estimated that this business event doubled the combined value of Musk's stakes in both X (up to a 74% stake in X) and xAI (53% stake) from the value prior to the merger.

81. Development of an artificial intelligence model like xAI includes training the model by feeding it data and content and thereby requires data sources.

82. As evidenced by X's terms of service and public statements made by Musk, xAI was trained on the content of X during the relevant time period of this claim.

83. During this process and during the relevant time period, xAI used the publicly available data that X has and is disclosing as its data source.

84. One of the training aspects of an AI model like xAI is continuous learning, and xAI continually trains on the content of X by continuously using X as its data source.

85. By using its content and data to train xAI, during the relevant time period, X disclosed, as defined by the NCII Statute, nonconsensual intimate images, including John Doe's, to xAI.

86. The disclosures of John Doe's NCII by X to xAI was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce.

87. John Doe did not consent to the disclosure of his NCII to xAI by X.

88. X knew that John Doe did not consent to disclosure of his intimate images to xAI by X or recklessly disregarded whether he consented to such disclosure(s).

89. X disclosed John Doe's intimate images to xAI, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without John Doe's consent, knowing that John Doe did not consent to such disclosures or in reckless disregard whether he consented to such disclosures, in violation of the NCII statute, and violation of his intellectual property right(s).

90. By making the decision to train xAI on the contents of X, X disclosed all of the NCII on X to xAI, and xAI induced the disclosure of all of the nonconsensual intimate images on X to xAI.

91. xAI is in possession of NCII, including John Doe's NCII.

92. Artificial intelligence is a rapidly evolving area, and with the "arms race" for top billing in the AI world playing out globally, proprietary information is hard to come by.

93. Upon information and belief, the most effective AI models are sophisticated systems that provide efficient mechanisms for the consumption of data and pathways for the transfer, as defined in the NCII Statute, of that data.

94. Upon information and belief, data that X disclosed to xAI, including NCII, meets the definition of intimate visual depiction(s) in the NCII Statute, because an intimate visual depiction includes data stored on computer disk or by electronic means which is capable of conversion into a visual image and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent form.

95. Upon information and belief, this portion of the definition is how data, including images, consumed by artificial intelligence models like xAI, is transferred (a/k/a disclosed under the NCII Statute) among its own systems.

96. Upon information and belief, an artificial intelligence model, like xAI, needs somewhere to store all of the data that it has consumed, and is continuing to consume, as part of the training, refinement and evolution of the system.

97. To that end, upon information and belief, xAI uses cloud services for data storage, including but not limited to services from Amazon Web Services and Oracle Cloud.

98. In addition to third-party data storage services, upon information and belief, data centers have been built for xAI data storage.

99. Currently, xAI has data centers in Memphis, Tennessee and Atlanta, Georgia.

100. The data center in Memphis, for example, has been dubbed the Memphis Supercluster by Musk, or Colossus.

101. To expand its data centers, it has been reported that xAI is looking to rent data center space in Saudi Arabia from Humain, an AI company backed by the Saudi government's public investment fund.

102. Domestically, it has been reported that xAI is looking at building a second data center in Memphis and has acquired a 1 million-square-foot property to do so.

103. Upon information and belief, in order to store the massive amounts of data it has received xAI discloses and/or transfers data, as defined in the NCII Statute, which includes John Doe's NCII that was disclosed from X to the cloud-based services it uses as well as its own data centers.

104. These transfers of NCII by xAI across its systems are disclosures, as defined in the NCII Statute.

105. From October 1, 2022, to November 14, 2024, the disclosures of John Doe's NCII by xAI was in or affecting interstate or foreign commerce or used means or facility of interstate or foreign commerce.

106. Between October 1, 2022, and November 14, 2024, John Doe did not consent to the disclosure of his NCII by xAI.

107. Between October 1, 2022, and November 14, 2024, xAI did not obtain John Doe's consent to disclose his intimate images on its platform.

108. From October 1, 2022, to November 14, 2024, xAI knew that John Doe did not consent to the disclosure of his NCII or recklessly disregarded whether John Doe consented to such disclosure(s).

109. From October 1, 2022, to November 14, 2024, xAI disclosed John Doe's intimate images, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, without John Doe's consent, knowing that John Doe did not consent to such disclosures or in reckless disregard whether he consented to such disclosures, in violation of the NCII statute.

110. As xAI continues to consume data, it will continue to be in possession of NCII that X has disclosed to it and will continue to disclose/transfer NCII across its systems.

111. And, upon information and belief, as long as there is xAI, it will continue to be vulnerable to attacks, hacking and security breaches, leaving the NCII of John Doe, and countless other persons, vulnerable to disclosure in this manner as well.

16

## CLASS ACTION ALLEGATIONS

112. This is a Class Action claim against the Defendants brought by Plaintiff on behalf of himself individually and the following Class of persons:

> **All persons whose intimate visual depiction and/or sexually explicit conduct, as defined in the NCII Statute, was disclosed, as defined in the NCII Statute, by X (formerly Twitter) or xAI without consent, where such disclosure was made by X or xAI with knowledge that there was no consent or with a reckless disregard as to whether there was a lack of consent to such disclosure, from October 1, 2022 to November 14, 2024.**

113. Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the Class definition.

114. Plaintiff sues on his own behalf and on behalf of the Class pursuant to Federal Rule of Civil Procedure 23.

115. Each proposed member of the Class was the victim of NCII.

116. ***Class Exclusions:*** The following people are excluded from the Class: 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant of its parents have a controlling interest and its current or former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the Class; 4) the legal representatives, successors, or assigns of any such excluded persons; 5) Plaintiff's counsel and Defendant's counsel.

117. ***Numerosity:*** Plaintiff does not know the exact size of the Class or the identity of Proposed Class members, since said information is in the exclusive control of and readily accessible to the Defendants. However, upon information and belief, based upon the number of X (formerly Twitter) MAUs and DBUs, the amount of nudity reported to be contained on X (formerly

Twitter), the amount of non-consensual nudity that is being removed,  and the fact that federal laws are being enacted to prevent and punish NCII disclosures, it is highly probable that the proposed Class is so numerous that joinder of members is impractical.

118. ***Commonality:*** All members of the Class have been subjected to and affected by the Defendants' non-consensual disclosure of intimate images.  There are common questions of law and fact that are applicable to the claims of all Class members who have had intimate images disclosed by the Defendants without consent in violation of the NCII statute.  Plaintiff's and Class members' claims raise predominantly factual and legal questions that can be answered for all Class members through a single Class-wide proceeding. Questions of law and fact arising out of Defendant's conduct are common to all members of the Class, and such common issues of law and fact predominate over any questions affecting only individual members of the Class. For example, to resolve the claims, it will be necessary to answer the following questions, each of which can be answered through common, generalized evidence:

    a.  Whether X and/or xAI's conduct violated the NCII Statute with respect to the proposed Class?

    b.  Whether X and/or xAI knew that Class members did not consent, or recklessly disregarded whether Class members had not consented, to the disclosure of their NCII?

    c.  Whether X can be held liable for disclosing Class members NCII which was initially posted to the platform by a third party?

    d.  Whether xAI can be held liable for disclosing Class members NCII which was disclosed to xAI by X?

    e.  Whether the Court can enter declaratory and injunctive relief?

f.  What is the proper measure of liquidated damages under the NCII Statute for each Class member?

g.  Whether and in what amount the Class is entitled to recover attorneys' fees and costs?

119. ***Typicality:*** Plaintiff's individual claims are typical of the claims that would be asserted by other members of the Class in that the Plaintiff and other members of the Class were subject to the same uniform practice by the Defendant of disclosing intimate images without consent, or with a reckless disregard as to the lack of consent, and in violation of the NCII statute. The Plaintiff and other Class members seek identical remedies under identical legal theories, were damaged by the same conduct of Defendant as complained of herein, and there is no material factual variation between Plaintiff's claims and those of the Class. Plaintiff's claims are typical of those of all members of the Class, and in proving his claims, Plaintiff will simultaneously prove the claims of all Class members. There is no antagonism or material factual variation between Plaintiff's claims and those of the Class.

120. ***Adequacy:*** Plaintiff will fairly and adequately protect the interests of the Class he represents because it is in his best interests to prosecute the claims alleged to obtain full redress due to him for the illegal conduct of which he complains. His interests do not conflict with the interests of the Class because one or more questions of law and/or fact regarding liability are common to all class members and by prevailing on his own claims, Plaintiff necessarily will establish liability to other class members. Plaintiff will fairly and adequately represent the interests of the Class and has no interests that are antagonistic to the interests of Class members. Plaintiff has retained counsel experienced in class action litigation and complex civil litigation to prosecute this action on behalf of the Class.

121. Plaintiff satisfies the numerosity, commonality, typicality, and adequacy prerequisites for suing as a representative party pursuant to Federal Rule of Civil Procedure 23(a).

122. In addition to satisfying Rule 23(a), a class action is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the questions of law and fact common to his claims and the claims of each member of the Class predominate over any question of law or fact affecting only individual members of the Class. Additionally, the prosecution of separate claims, by or against individual members of the Class, would create a risk which would, as a practical matter, be dispositive of the interests of other member of the Class who are not parties to the adjudication, or would substantially impair or impede the ability of other members of the Class who are not parties to the adjudication to protect their interests. Class Representation is therefore clearly the superior procedural vehicle for the fair, consistent and efficient adjudication of the claims asserted herein, given that common questions of law and fact predominate over any individual questions that may arise, and significant economies of time, effort, and expense will inure to the benefit of the court and the parties in litigating the common issues on a Class-wide basis instead of a repetitive individual basis; many Class members' individual damage claims are too small to make individual litigation an economically viable alternative, and few Class members have an interest in individually controlling the prosecution of a separate action; despite the relatively small size of many individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a Class action on a cost-effective basis, especially when compared with repetitive individual litigation; given the size of individual Class members' claims, few Class members could afford to seek legal redress individually for the wrongs Defendant committed against them; when the liability of the Defendant is adjudicated, claims of all members of the Classes can be determined

by the Court; this action will facilitate the orderly and expeditions administration of the Classes' claims, economies of time, effort and expense will be fostered and uniformity of outcome will be ensured without a class action, the Class members will continue to suffer damages and Defendant's violations of law will proceed without remedy while Defendant continues to reap and retain the proceeds of its wrongful conduct; and no unusual difficulties are likely to be encountered in the management of this class action. California jurisdiction exists for both defendants, and venue in the Northern District and specifically the San Francisco Division is appropriate under Twitter and X User Agreements.   The proposed class will include Californians, including residents of this District.  Class certification under Rule 23(b)(2) is also appropriate because Defendants acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.  In the absence of appropriate injunctive and/or declaratory relief, Defendants will continue to violate the NCII Statute by disclosing intimate images without the respective individual's consent.   The prerequisites for Class wide injunctive relief exists, and if injunctive relief is not granted, great harm and irreparable injury to Plaintiff and Class members will continue.

## FIRST CAUSE OF ACTION AND PRAYER FOR RELIEF

### Violations of 15 U.S.C. § 6851 – Against Defendant X (formerly Twitter)

123. Plaintiff John Doe, on behalf of himself and the proposed Class, adopts, re-alleges, and reaffirms the allegations in ¶¶ 1 – 122, as if each were fully set out herein, and further alleges as follows:

124. Plaintiff, and the Class Members, were depicted individuals whose intimate visual depictions were disclosed, as defined in the NCII Statute, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, by Defendant X.

125. Plaintiff and the Class Members did not consent to X's disclosures.

126. In disclosing the Plaintiff's and Class Members' intimate visual depictions, X knew that Plaintiff and the Class Members did not consent to such disclosures or recklessly disregarded whether Plaintiff and the Class Members consented to such disclosures.

127. As a consequence, Plaintiff and the Class Members are entitled to recover liquidated damages in the amount of $150,000 per each and every disclosure per Plaintiff and each Class Member occurring from October 1, 2022, to November 14, 2024, as set forth in § 6851(B)(3)(A)(I).

128. In addition, Plaintiff and Class Members are entitled to recover the cost of the action, including attorney's fees and other litigation costs incurred; injunctive relief; and to maintain the confidentiality of Plaintiff using a pseudonym and all class members using pseudonyms.[9]

129. Plaintiff and Class members, pray that this Honorable Court award damages pursuant to 15 U.S.C. § 6851(B)(3)(A)(I);  enjoin the Defendants as permitted  pursuant to 15 U.S.C. § 6851(B)(3)(A)(II);   award attorney's fees and costs pursuant to 15 U.S.C. § 6851(B)(3)(A)(I); permit Plaintiff, and class members if applicable, to proceed under pseudonyms pursuant to 15 U.S.C. § 6851(B)(3)(B); and such other relief as this Court deems just and proper.  Further it is requested that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23; appoint the undersigned and law firm as Class counsel; and appoint Plaintiff John Doe as Class representative.

---

[9] See § 6851(B)(3)(B).

## SECOND CAUSE OF ACTION AND PRAYER FOR RELIEF

### Violations of 15 U.S.C. § 6851 – Against Defendant xAI

130. Plaintiff John Doe, on behalf of himself and the proposed Class, adopts, re-alleges, and reaffirms the allegations in ¶ 1 – 122, as if each were fully set out herein, and further alleges as follows:

131. Plaintiff, and the Class Members, were depicted individuals whose intimate visual depictions were disclosed, as defined in the NCII Statute, in or affecting interstate or foreign commerce or using any means or facility of interstate or foreign commerce, by Defendant xAI.

132. Plaintiff and the Class Members did not consent to disclosures to or by xAI.

133. In disclosing the Plaintiff's and Class Members' intimate visual depictions, xAI knew that Plaintiff and the Class Members did not consent to such disclosures or recklessly disregarded whether Plaintiff and the Class Members consented to such disclosures.

134. As a consequence, Plaintiff and the Class Members are entitled to recover liquidated damages in the amount of $150,000 per each and every disclosure per Plaintiff and each Class Member occurring from October 1, 2022, to November 14, 2024, as set forth in § 6851(B)(3)(A)(I).

135. In addition, Plaintiff and Class Members are entitled to recover the cost of the action, including attorney's fees and other litigation costs incurred; injunctive relief; and to maintain the confidentiality of Plaintiff using a pseudonym and all class members using pseudonyms.[10]

136. Plaintiff and Class members, pray that this Honorable Court award damages pursuant to 15 U.S.C. § 6851(B)(3)(A)(I);  enjoin the Defendants as permitted  pursuant to 15 U.S.C. § 6851(B)(3)(A)(II);  award attorney's fees and costs pursuant to 15 U.S.C. § 6851(B)(3)(A)(I); permit Plaintiff, and each class member if applicable, to proceed under pseudonyms pursuant to

---

[10] SEE § 6851(B)(3)(B).

15 U.S.C. § 6851(B)(3)(B); and such other relief as this Court deems just and proper.  Further it is requested that the Court certify this action as a class action pursuant to Federal Rule of Civil Procedure 23; appoint the undersigned and law firm as Class counsel; and appoint Plaintiff John Doe as Class representative.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and Class Members hereby demand a trial by jury.

Dated: November 21, 2025                                  Respectfully Submitted,

 

/s/ Charla G. Aldous                                    .

Rosalyn Sia Baker-Barnes*                 Charla G. Aldous
Florida Bar No.: 327920                        State Bar No. 20545235
rsb@searcylaw.com;                             caldous@aldouslaw.com
 baker-barnesteam@searcylaw.com    Caleb M. Miller
John Scarola*                                        State Bar No. 24098104
Florida Bar No.: 169440                        cmiller@aldouslaw.com
jsx@searcylaw.com;                             ALDOUS LAW
 scarolateam@searcylaw.com            4311 Oak Lawn Ave., Suite 150
F. Gregory Barnhart*                            Dallas, TX 75219
Florida Bar No.: 217220                        Phone: (214) 526-5595
fgb@searcylaw.com;                            Fax: (214) 526-5525
 barnhartteam@searcylaw.com          Attorneys for Plaintiff(s)
T. Hardee Bass, III*
Florida Bar No.: 0011055                       and
thb@searcylaw.com;
thbteam@searcylaw.com
SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 200-1087
Attorneys for Plaintiff(s)

*Pro Hac Vice applications pending

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, as authorized by Federal Rule of Civil Procedure 5(b)(2)(E), which will send notification of such filing to all parties that are CM/ECF participants in this action.

By:    /s/ Caleb M. Miller
CALEB M. MILLER